IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

GORDON L. M.,[1]                    )
                                    )
            Plaintiff,              )
                                    )
v.                                  ) Case No. 20-cv-398-RJD[2]
                                    )
COMMISSIONER of SOCIAL SECURITY,    )
                                    )
            Defendant.              )
                                    )

**MEMORANDUM AND ORDER**

**DALY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff applied for DIB in December 2015, alleging he became disabled in September 1992 (Tr. 138). Plaintiff's claim was denied through the administrative process following a hearing, resulting in an unfavorable ALJ decision dated November 2, 2016 (Tr. 16-31). The claim proceeded to this Court, resulting in the entry of an Order dated October 23, 2017 remanding the claim to the Commissioner for rehearing (Tr. 684-685; 691-705). ALJ Michael Scurry again held a hearing and issued an unfavorable decision on July 9, 2018 (Tr. 617-640). The claim once again

---

[1] In keeping with the court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] Pursuant to 28 U.S.C. §636(c), this case was assigned to the undersigned for final disposition upon consent of the parties (Doc. 12).

Page **1** of **16**

proceeded to this Court and an Order was entered on July 30, 2019 remanding the claim to the Commissioner for rehearing (Tr. 2333-2344). Upon rehearing, ALJ Jason Yoder issued an unfavorable decision on February 5, 2020 (Tr. 2226-2255). Plaintiff did not file written exceptions and the Appeals Council did not review the ALJ's decision. Plaintiff timely filed this case on May 1, 2020 (Doc. 1).

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

1. The ALJ erred by failing to comply with the requirements of SSR 18-01p[3].

2. The ALJ erred in failing to find Plaintiff was disabled due to absenteeism caused by his exposure to weather that was either humid, hot, or below freezing.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes[4]. Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform his former occupation? and (5) Is the

---

[3] In Section V of his Brief, "Issues," Plaintiff cites to SSR 18-2p; however, this citation appears to be in error as he later cites 18-01p in the Argument portion of his Brief.
[4] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.

plaintiff unable to perform any other work?  20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled.  A negative answer at any step, other than at step three, precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four.  Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show that there are jobs existing in significant numbers in the national economy which plaintiff can perform. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).  Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  *See Parker v. Astrue*, 597 F.3d 920, 921

(7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

In his opinion, ALJ Yoder followed the five-step analytical framework described above. The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act on December 31, 1997 (Tr. 2231). The ALJ determined that Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of September 3, 1992 through December 31, 1997, the date of last insured (*Id.*). The ALJ found that through the date of last insured, Plaintiff had the following severe impairments: a history of infection secondary to a tooth abscess, interstitial pulmonary fibrosis, a history of mediastinitis and bilateral empyemas, chronic plural thickening, and restrictive ventilatory defect with a history of emphysema and tracheostomy (Tr. 2232). The ALJ determined that through the date of last insured Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526) (Tr. 2233). The ALJ specifically considered Listing 3.02 in this regard (Tr. 2234).

The ALJ found that through the date last insured, Plaintiff had the residual functional capacity to perform a full range of sedentary work as defined under 20 C.F.R. § 404.1567(a), with the following exceptions and/or qualifications: he can never climb ladders, ropes or scaffolding; he can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; he must avoid concentrated exposure to dangerous workplace hazards such as exposed moving machinery and unprotected heights; and he must avoid all exposure to humidity, temperature extremes such as heat and cold, fumes, odors, dusts, gases, and areas of poor ventilation (Tr. 2235).

Based on the testimony of a vocational expert, the ALJ concluded that Plaintiff is unable to perform past relevant work, but concluded there are jobs that exist in significant numbers in the national economy that Plaintiff can perform (Tr. 2245-46).

## The Evidentiary Record

The Court reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to Plaintiff's arguments.

1. **Agency Forms**

Plaintiff was born in 1969 (Tr. 161). He was insured for DIB through December 31, 1997 (Tr. 209). Plaintiff was 28 years old on the date of last insured (Tr. 54). Plaintiff's alleged onset date is September 3, 1992 (Tr. 161). Plaintiff completed a disability report dated December 29, 2015, wherein he listed the following as conditions that limit his ability to work: COPD, bilateral hip replacement, manic depression, schizoaffective disorder (Tr. 165). At the time of his Disability Determination Explanation in February 2016, Plaintiff was 68 inches and weighed 245 pounds (Tr. 54).

2. **Evidentiary Hearings**

Plaintiff was represented by counsel at all three evidentiary hearings in this matter. The first evidentiary hearing was held on October 19, 2016 (Tr. 32). Plaintiff testified that he developed a tooth infection while in basic training after joining the military in August 1992 (Tr. 41-42). Numerous complications stemming from the tooth extraction developed and resulted in a hospital stay (Tr. 42).

Plaintiff testified he had not engaged in any work since September 1992 as it is hard for

him to get around and he needs to take many breaks if he is walking (Tr. 48-49). Plaintiff testified he would not need to take these breaks if he was doing secretarial-type work (Tr. 49).

Plaintiff further testified that his lungs had not improved since 1993 and he expects to be on oxygen constantly in the next few years (*Id.*). Plaintiff testified he has good days and bad days, and it is easier for him to breathe when it is not humid (Tr. 50). Plaintiff testified that when it is very humid, the air feels heavy and it is harder for him to breathe and move around (*Id.*). He would not be able to do a secretarial-type job on his bad days (Tr. 51).

Plaintiff testified at the second evidentiary hearing on June 14, 2018 (Tr. 641). At this hearing, Plaintiff testified he had one hip replaced in 2006, and the other hip replaced in 2007 (Tr. 651). Plaintiff testified that between 1993 and 1997 he could stand for about thirty minutes at a time before he had to rest (Tr. 655). The weather affected his breathing during this time and he could not leave the house on days when it was very hot (95 degrees or higher), very cold (below freezing), or humid (70% of above) (Tr. 655-56).

At the third hearing on January 16, 2020 (Tr. 2256), Plaintiff again testified that it was difficult for him to walk between 1993 and 1997 and he would need frequent breaks (Tr. 2268). Plaintiff also reiterated his difficulty in engaging in any activity when the weather was humid or very cold (Tr. 2269).

A medical expert, Dr. Holan, also testified at the January 16, 2020 hearing (Tr. 2285). For the relevant timeframe of September 3, 1992 to December 31, 1997, Dr. Holan testified that Plaintiff had the following medically identifiable impairments: a history of mediastinitis and bilateral empyemas that were treated while he was hospitalized from November 1992 to March 1993; chronic pleural thickening; and restrictive ventilatory defect by pulmonary function testing

(Tr. 2287-88). Dr. Holan testified that prior to Plaintiff's hospital discharge in 1993, he underwent pulmonary function testing that indicated a forced expiratory volume of 0.90 and forced vital capacity of 0.92, both of which are at listing level for 3.02 category of impairment (Tr. 2288). Dr. Holan testified that the March 4, 1993 spirometry testing occurred within 30 days of Plaintiff's hospital stay for his prolonged illness with surgical procedures (Tr. 2289).

The next pulmonary function test in the record was completed in August 2010 (Tr. 2290). This test revealed a forced vital capacity of 1.88 liter, and force expiratory volume of 1.54 liter, which meet the criteria for Listing 3.02A (forced expiratory volume) and 3.02B (forced vital capacity) (Tr. 2290).

Dr. Holan testified that the initial pulmonary function tests in March 1993 were "probably lower than they would be if [Plaintiff] was well and stable … and able to give a good effort," as he had been through a prolonged illness and had not been eating well at the time (Tr. 2292). Dr. Holan further testified that the "values from March of 1993 prior to [Plaintiff's] discharge were maybe slightly falsely low" due to poor lung capacity (Tr. 2292-93). Dr. Holan testified that between the 1993 test and the 2010 test, Plaintiff "probably would've shown some improvement, but it would've been steady improvement" (Tr. 2291).

Dr. Holan indicated Plaintiff would need to avoid all exposure to temperature extremes of heat and cold, as well as humidity as these conditions would have a "significantly deleterious effect on [Plaintiff's] pulmonary function" (Tr. 2294-96).

A vocational expert, David Salewsky, testified at the hearing on January 16, 2020 (Tr. 2297). Mr. Salwesky testified that an individual of Plaintiff's age, education and past work experience, who would be limited to sedentary work with certain limitations, including avoidance

of all exposure to humidity and temperature extremes, could perform various occupations, including patcher, touch-up screener, or addresser (Tr. 2298-99). These occupations would not be available if an individual, such as Plaintiff, required two 30-minute unscheduled breaks during the workday or would be absent from the workplace two days a month on average (2299-2300).

### 3. Relevant Medical Records

Following a tooth extraction while in basic training after joining the military in August 1992, Plaintiff suffered numerous complications and an extended hospital stay from November 3, 1992 to March 10, 1993 (Tr. 605-611). Plaintiff underwent a pulmonary function test ("PFT") on March 3, 1993, which demonstrated a forced vital capacity ("FVC") of 0.92, and a forced expiratory volume in one second ("FEV-1") of 0.90 (Tr. 611). Another PFT was planned in six months, but there is no record of it (Tr. 611). Plaintiff's diagnosis at discharge on March 10, 1993 was severe pulmonary restrictive disease secondary to pulmonary fibrosis as a result of extensive empyemas requiring decortication (Tr. 607).

On June 29, 2010, Plaintiff was given a provisional diagnosis of dyspnea and scheduled for a PFT and an echocardiogram (Tr. 1856). The PFT was performed on August 17, 2010, and it demonstrated good effort (Tr. 1859-60). Plaintiff's FVC was 1.88L (37% of predicted value), and his FEV1 was 1.54L (38% of predicted value) (Tr. 1860). Lung volume measurements showed total lung capacity was 46% of predicted value, residual volume was 63% of predicted value, and the residual capacity was 52% of the predicted value (*Id.*). The diffusion capacity of the lung for carbon monoxide was 52% of the predicted value, and when adjusted for alveolar volume, was 146% of the predicted value (*Id.*). The reviewing physician found Plaintiff's lung volume measurements suggestive of a moderate restrictive process, and questioned whether any

lung tissue had been removed, noting Plaintiff had undergone a thoracotomy (*Id.*).

On December 24, 2014, Plaintiff reported a history of dyspnea for 7-8 months (Tr. 1749-50). Plaintiff indicated his dyspnea was worse over the past six months (Tr. 1755). A PFT was performed on December 24, 2014, for which Plaintiff demonstrated good effort (Tr. 1558). Plaintiff's FVC was 1.54L, which was 31% of the predicted value, and Plaintiff's FEV1 was 1.22L, which was 31% of the predicted value (*Id.*). When a bronchodilator was administered, Plaintiff's FVC increased by 2% and his FEV1 increased by 8% (*Id.*). The diffusion capacity of the lung for carbon monoxide was 68% of the predicted value, and when adjusted for alveolar volume, was 171% of the predicted value (Tr. 1559). Plaintiff's gas-maldistribution was consistent with emphysema (*Id.*). The results of the PFT were compatible with mixed obstructive and restrictive lung disease (*Id.*). Plaintiff was evaluated for home oxygen on this date and prescribed two liters per minute during exercise and two liters per minute at night (Tr. 1546-47).

Plaintiff continued to be seen for complaints of shortness of breath through 2017, and on December 7, 2017, his home oxygen was increased to three liters per minute with exercise and two liters per minute at night (Tr. 1500). Plaintiff was not assessed as needing continuous oxygen (*Id.*).

    **4. Treating Physician Daniel W. Belcher, M.D.**

Dr. Belcher treated Plaintiff during his hospitalization at the VA Medical Center and as an outpatient following his discharge (Tr. 610). On April 25, 1994, Dr. Belcher authored a report summarizing Plaintiff's history since his 1992-1993 hospitalization (Tr. 610-11). Dr. Belcher opined that Plaintiff's condition had stabilized and that he had significantly reduced respiratory status from normal for a man of his age (Tr. 611). Dr. Belcher noted that Plaintiff seemed to be

coping with his limited respiratory status and was active and able to perform activities of daily living (*Id.*). Dr. Belcher opined that it seemed Plaintiff would have a permanent disability with respect to his pulmonary status (*Id.*).

### 5. Non-Examining State Agency Consultant Physician – Steven A. Golub, MD

Steven A. Golub, MD, is an internist who was retained by ALJ Michael Scurry to answer interrogatories on Forms HA-1151-BK and HA-L70 (Tr. 875-886). Dr. Golub provided answers to the interrogatories on February 6, 2018 (Tr. 889-98). Dr. Golub indicated that the incident in 1992 was "quite severe and clinically significant" (Tr. 896). Dr. Golub found that Plaintiff met Listing 3.02 noting that "[p]ost incident [Plaintiff] had clinical manifestations of compromised pulmonary function with a requirement for supplemental oxygen/oxygen desaturation which would be expected to remain permanent" (Tr. 897). Dr. Golub also remarked that pulmonary function testing was not noted in the clinical records (*Id.*).

Dr. Golub opined that Plaintiff could never tolerate exposure to unprotected heights, pulmonary irritants, extreme cold, and extreme heat (Tr. 893), and could occasionally tolerate exposure to humidity and wetness (*Id.*).

### Analysis

Plaintiff first argues that the ALJ erred by failing to find Plaintiff's pulmonary impairment met the requirements of Listings 3.02(A) and 3.02(b) since at least March 1993. Plaintiff contends that the ALJ was mandated to conclude Plaintiff met the requirements of Listing 3.02(A) and Listing 3.02(B) and find him disabled pursuant to 20 C.F.R. § 404.1520(a)(4)(iii), but failed to do so. Plaintiff asserts SSR 18-01p governs his claim and dictates that for non-traumatic claims such as Plaintiff's, disability is determined by the first date the claimant met that definition.

Plaintiff contends that he met Listing 3.02(A) and 3.02(B) since March 1993 and, as such, was disabled as of that date. Plaintiff does not develop this argument, and it is not clear how it fits within the context of this case as the parties agree the relevant date of disability is September 3, 1992. Insofar as Plaintiff makes this argument, it seems to be in support of his broader argument that he met Listing 3.02. Thus, the Court focuses its consideration on whether Plaintiff met the Listing requirement of 3.02.

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled. The Listings are found at 20 C.F.R. Pt. 404, Subpt. P, App. 1. In order to be found presumptively disabled, the claimant must meet all of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis." 20 C.F.R. §404.1525(d). The claimant bears the burden of proving that he meets or equals a listed impairment. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). When evaluating whether an impairment is presumptively disabling under a listing, the ALJ "must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Jeske v. Saul*, 955 F.3d 583, 588 (7th Cir. 2020) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)).

The 3.00 series of the Listings covers respiratory disorders. As is relevant here, Listing 3.02(A) requires an "FEV1" less than or equal to a value ascribed based on age, gender, and height without shoes. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.02A. In this instance, the value provided for Plaintiff, a male, age 20 or older, at a height of 68 inches without shoes requires a FEV1 less than or equal to 1.60. Listing 3.02(B) requires an FVC of less than or equal to a value ascribed based on age, gender, and height without shoes. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.02B.

The value provided for Plaintiff, a male, age 20 or older, at a height of 68 inches without shoes requires a FVC less than or equal to 2.0.

It is apparent from the record that Plaintiff's March 1993, August 2010, and December 2014 FEV1 tests all measure below the 1.60 requirement. Plaintiff's March 1993, August 2010, and December 2014 FVC tests also all measured below the 2.0 requirement. However, as testified to by Dr. Holan, the March 1993 test (the only test in the record taken during the relevant time, prior to Plaintiff's date last insured) did not meet the requirements for acceptable results. More specifically, the relevant Listing states that the claimant "must be medically stable at the time of the test." 20 C.F.R. Pt. 404, Subpt. 9, App. 1, § 3.00E. The Listing provides examples of when a claimant would not be considered medically stable: (i) within 2 weeks of a change in claimant's prescribed respiratory medication. (ii) experiencing, or within 30 days of completion of treatment for, a lower respiratory tract infection. (iii) experiencing, or within 30 days of completion of treatment for, an acute exacerbation (temporary worsening) of a chronic respiratory disorder; or (iv) hospitalized, or within 30 days of a hospital discharge, for an acute myocardial infarction (heart attack). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00E(2)(a). Dr. Holan indicated that Plaintiff's March 1993 pulmonary function tests were taken while he was in the hospital for a prolonged illness and had underwent surgical procedures. As such, Dr. Holan testified that due to his hospital stay and prolonged illness, the March 1993 results may be "slightly falsely low" and were "probably lower" than the results would have been if Plaintiff had been stable and was able to give a good effort (Tr. 2292-93).

In the Court's July 30, 2019 Order remanding this matter to the Commissioner for rehearing, it determined the ALJ failed to discuss Plaintiff's March 1993 test in relation to other

tests from years later, which tended to show a trend of Plaintiff meeting the Listing. The Court also noted the ALJ failed to discuss this trend in combination with Dr. Golub's opinion that, for the period of September 3, 1992 to December 31, 1997, Plaintiff met the Listing.

Defendant asserts AJL Yoder reasonably determined that Plaintiff did not meet Listing 3.02 for chronic respiratory disorders, and the ALJ's discussion was far beyond perfunctory. The Court agrees.

In his decision, ALJ Yoder found there were no *valid* pulmonary function tests completed prior to the date last insured supporting a finding that Plaintiff met or medically equaled Listing 3.02. ALJ Yoder placed considerable weight in formulating this opinion on the testimony of Dr. Holan, noting Dr. Holan's opinion was consistent with the medical evidence of record showing Plaintiff does not meet or medically equal Section 3.02 of the Listing of Impairments. ALJ Yoder also indicated that Dr. Holan had the opportunity to review the entire record, hear testimony, answer questions from the ALJ, and answer questions from Plaintiff's counsel.

Plaintiff asserts ALJ Yoder misconstrued Dr. Holan's testimony and the gap in treatment. In particular, Plaintiff notes that ALJ Yoder asked Dr. Holan to consider whether Plaintiff had improved some time "in the middle of" the March 1993 testing and the August 2010 testing, and then declined again (Tr. 2291). Plaintiff asserts Dr. Holan opined that Plaintiff would have shown "steady improvement," meaning the March 1993 results were the "nadir" of Plaintiff's pulmonary function between the March 1993 test and the August 2010 test (Tr. 2291). Dr. Holan's testimony on this is not quite as clear as Plaintiff makes it seem. In response to questioning regarding Plaintiff's possible improvement between March 1993 and August 2010, Dr. Holan testified that Plaintiff "probably would've shown some improvement, but it would've been steady

improvement." This statement is inartful and suffers from inconsistencies contained therein. Thus, the Court cannot find this statement supports a finding that Plaintiff met or equaled the Listing requirements of 3.02 at the relevant time. Indeed, the evidence clearly establishes there were no acceptable pulmonary test results while Plaintiff was medically stable during the relevant time that showed he met Listing 3.02. Moreover, when asked whether Plaintiff would have equaled the relevant listing, Dr. Holan testified that the March 1993 values were "slightly falsely low" (Tr. 2293). ALJ Yoder specifically considered this statement in rendering his opinion (Tr. 2234).

With regard to Dr. Golub's opinion that Plaintiff's breathing impairment equaled the listing at 3.02, noting that "[p]ost incident [Plaintiff] had clinical manifestations of compromised pulmonary function with a requirement for supplemental oxygen/oxygen desaturation which would be expected to remain permanent," the Court finds ALJ Yoder adequately explained why he gave such opinion little weight. Indeed, ALJ Yoder indicated that Dr. Golub's opinion was faulty insofar as he explicitly based his opinion on Plaintiff's current use of supplemental oxygen, which occurred nearly 20 years after the relevant period of adjudication, and that said opinion was inconsistent with earlier medical records indicating Plaintiff had only mild dyspnea on exertion and no major active health problems (Tr. 2244).

Plaintiff also argues the ALJ erred in failing to find he was disabled due to absenteeism caused by his exposure to weather that was either humid, hot, or below freezing. Plaintiff asserts that his testimony, along with the testimony of Dr. Holan and the VE support the finding that Plaintiff is not able to perform substantial gainful activity based on the ALJ's RFC determination. In support of this argument, Plaintiff cites the National Weather Service and the days in

Springfield, Illinois on which the temperature or humidity, or both, would cause Plaintiff to miss work. Plaintiff asserts his tolerance for leaving his home would be about 5 out of 7 days, and cause him to exceed employer absentee tolerance.

Defendant asserts absenteeism is not dispositive evidence of disability, particularly when, as here, Plaintiff has failed to link his conditions to a work-preclusive level of absenteeism. In support of this argument, Defendant asserts the only evidence Plaintiff cites to support his argument of work-preclusive absenteeism is his own testimony. Defendant argues Plaintiff has failed to cite any objective medical evidence or medical source opinion evidence linking his pulmonary impairments to an inability to go to work on days when the temperature was humid, hot, or cold.

Plaintiff testified that hot, humid, and cold weather make breathing difficult. Plaintiff further testified that he could not leave his house on days when it was very hot, very cold, or humid. Dr. Holan also testified that Plaintiff would need to avoid all exposure to temperature extremes of heat and cold, as well as humidity, as these conditions would have a "significantly deleterious effect on his pulmonary function" (Tr. 2294-96). In consideration of Plaintiff's ability to perform sedentary work, ALJ Yoder indicated that Plaintiff must avoid all exposure to humidity and temperature extremes such as heat and cold. These limitations were considered in the vocational expert's opinion wherein he indicated there were jobs in the national economy that would be available to someone with Plaintiff's limitations. While the vocational expert indicated that these jobs would no longer be available if an individual were to be absent from the workplace two times per month, Plaintiff has not set forth any objective evidence that he would be unable to attend work at least two times per month due to his condition. Moreover, the ALJ noted there was evidence

Plaintiff was able to spend time outside in a hot climate with humidity, and Plaintiff's testimony to the contrary conflicted with objective evidence in the record.

### Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**DATED: May 7, 2021**

*s/ Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**